The best case is 08-1594-09-1070. Janssen Pharmaceutical v. Teva Pharmaceutical. Mr. Pappas. Good morning, Your Honor. This case comes before you today on a very narrow issue of appeal, and that's only the question of enablement and our contention in belief that the lower court applied an incorrect standard, first of all, to determine the question of enablement, and second, that the defendants did not meet their burden by clear and convincing evidence that the 318 patent was not enabled, specifically with the prong of enablement utility. Let me turn first to what we believe was an argument made by the defendants below that led the district court to err. The problem is looking at this patent, what is it that she, the inventor, contributed here other than summarizing some prior art and saying that maybe this would be useful or we'll investigate whether this would be useful for the treatment of Alzheimer's. Where is it? What did she do? She didn't do any testing, right? That's correct, Your Honor. No, there was testing required. I opposed some testing, but so where's the inventive contribution? Why would someone reading this think that this was likely to be efficacious? It has an idea that it might be, but where in reading it do you get the proof that it's likely to be efficacious? In several places, Your Honor. First of all, let's start with the proposition that the patent, as we know, is to be read and interpreted by one ordinary skill in the art. And all the skilled artisans that testified in this case found that they could make and use the invention based on the disclosures in the 318 patent and that the invention of Dr. Bonnie Davis was scientifically reasonable and they believed it. So, in effect, the basic showing of utility was made. Now this is what Dr. Davis contributed. Does that testimony really go to the proof that someone skilled in the art would view it as efficacious? That testimony seems to be off point in that respect. Your Honor, I respectfully disagree. I don't think it's off point. I think that as we understand the law of enablement, first of all, based on the patent document, one has to be able to make and use the invention based on the disclosures therein. The testimony was uncontroverted by the skilled artisans that that could be done. There is the additional prong of enablement that says that the skilled artisan needs to appreciate what's commonly referred to as enablement utility. And these skilled artisans said they believed it would be efficacious to treat Alzheimer's. And, Your Honor, the evidence is in the patent. First of all, Dr. Davis, you asked me another part of the question, Judge Dyke, about what Dr. Davis contributed to the art. What she contributed, and is disclosed in the 318 patent, is that galantamine, the drug galantamine that had been around for years, could actually be used to effectively treat Alzheimer's. Well, but where does actually? How do I get that out of the patent? It just lists this prior art. None of this prior art suggests that it could be used to treat Alzheimer's, that it would work. Indeed, you'd have an obviousness problem if it did. But so, you know, where is she coming up with something new here other than a simple idea of using this substance that had proved to be perhaps efficacious with respect to non-progressive dementia? She had the idea of using that for progressive dementia. So what is that more than an idea under Rasmussen? Your Honor, first of all, she appreciated, number one, that contrary to current thinking at the time, that it was the muscarinic receptor was involved in Alzheimer's with memory. It also involved the nicotinic receptor. Where does she say that in the patent? She does, Your Honor, in a couple of places. First of all, let's start with the animal model that is disclosed in column two, lines 44 through 55. That discloses a selective lesion model in the subcortical nucleus with a resultant cortical cholinergic deficiency similar in magnitude to that seen in early to moderate stage Alzheimer's disease. That is a specific disclosure of a model with the site below it in 1985 for replication of those conditions that constitute Alzheimer's disease. And Dr. Davis further discloses... Why does that suggest that the nicotinic receptors are involved, that there's some insight on that point? In the next sentence, Your Honor. When the patent reads, numerous behavioral deficiencies including the inability to learn and retain new information characterizes the lesion. Inability to learn. The skilled artisans testify that one of ordinary skill in the art, reading inability to learn, knows that's the nicotinic receptor. And retain new information, that's memory. That's the muscarinic receptor. So to those of skill in this art, reading this model, she discloses a model that says Alzheimer's disease, she appreciates, has two parts. Memory and the ability to learn. At that time, most of the people were focusing on memory. But it discloses the ability to learn, which is the nicotinic receptor. And then specifically calls it out as one of the lesions of Alzheimer's disease. Now, let's read the patent in its entirety. Let's now go to column one. The two Kozunidis references. She saw something in the prior art that others had not seen. Kozunidis reports that in tolerable and safe doses, galantamine results in the rise of cortisol. Now, what we know from both Kozunidis references is that atropine was used. That blocks the muscarinic receptor. Therefore, the nicotinic receptor is at work. Where is the error that was made by Judge Robinson below in enablement? The error. She listed all of the proper law. Did she misapply it? Where is the error? Your Honor, we believe the error is. Reversible. Reversible error. Of course, Your Honor, I know that's all we're here for. We're here for that, right? Chief Judge Mark used to say, you will reverse judgments and reversible error, not all error. She begins by citing the correct law of enablement in her opinion. And then takes issue with the defendant's contention that Rasmussen requires absolute certainty. But then where she errs is she adopts the defendant's proposition that because she has found, Judge Robinson, the patent not obvious, then it cannot be enabled. And she says that because she accepted the defendant's argument that if an inventor sees what no one else can see from the prior art and combines known elements in a novel and useful way, somehow it's either obvious and enabled or it's not obvious and it cannot be enabled. That's the error of law. And let me focus on that error and why I think she got there. The first part of her opinion, she goes to great detail in factual findings to support her opinion that it was not obvious. As this Court knows, obviousness is measured by looking at the invention as it's disclosed and then measuring it against the entirety of the prior art. Enablement does not concern itself with the entirety of the prior art. It looks only at the art that is disclosed in the patent, the template, if you will, and asks this question only based on what is disclosed in the patent to one of ordinary skill in the art. Can you make and use the inventions? But the efficacy question is a fact question, right? They should depend on fact questions, Judge Ike. I agree. Unlike enablement, make and use, which seems to be a question of law, that the utility aspect of enablement, the efficacy question, whether someone skilled in the art would understand that this was efficacy is a fact question. She had a hearing. She had a trial. She reached a conclusion. So why don't we defer to that conclusion? And the answer to that, Your Honor, quite candidly, is under Rule 52A, as this Court has interpreted several times, she did not make factual findings. You can comb the four or five pages of her very lengthy opinion that was devoted to enablement, and she did not make factual findings. Regarding what issue? The enablement issue regarding the prior art, which she took in the entire universe, which was taken in basically by the issue of the non-obviousness and obviousness issue. Right. Was the prior art issue for enablement limited to the aspects of what's disclosed in the patent application? The prior art that's disclosed in this application lists four or five different items. Right. Correct. Does she have limited that analysis to those four or five items instead of the entire universe of the prior art? That for her enablement opinion, yes, because the question, Judge Garrison, is does the template teach one how to make and use the invention? Does it disclose utility? Otherwise, this Court has repeatedly said you cannot use the template to look backwards. She did not make specific factual findings. And I tell the Court the reason she didn't make factual findings is because the defendants had no evidence. Let me… So you're asking us to send it back for her to make specific findings? Your Honor, remand is certainly a possibility. But we're not asking… Right. And the reason we ask that… Your Honor, that's certainly one way to view this appeal. Rule 52, if you find that there were not sufficient factual findings, we find there were none, specific factual findings to the record. And this Court has repeatedly held you need to do so. You can remand. But if you're telling us that there's no factual finding to that issue… That's my next point. The point should be to remand it rather than reverse it. Well, if there's no factual basis, though, in the record, this is the reason we believe you should reverse and enter judgment. Because if you look, while remand is certainly a possibility… You didn't say it wasn't in the record. You just said she didn't make the findings. Your Honor, we're saying it's not in the record. Where do you raise the issue about the failure to make findings? Your Honor, that's throughout our… It's in our reply brief. Well, you have to raise it in the opening brief. Where in the opening brief do you say that the judgment ought to be set aside because she didn't make the findings required under Rule 52? If you give me a moment, Your Honor, I know that we've raised it in the opening brief. Your Honor, the enablement ruling was erroneous as a matter of law beginning with pages 26. You certainly argue that the ruling was erroneous as a matter of law, and you want judgment in your favor. But where do you say that she didn't make the findings she had to make? Your Honor, throughout our brief, we argued that it's erroneous because there was no evidence supporting it. Yeah, you do make that argument, but where do you make the argument that she didn't make the required findings? That's made in the reply brief specifically, Your Honor. But not in the opening brief? I can't find it right now. Your Honor, do you want to save your rebuttal? Yes, Your Honor, I do. Mr. Lombardi? Thank you. May it please the Court, George Lombardi on behalf of Barr Laboratories. The district court correctly determined that the 318 patent is not enabled by disclosure. The patent sets forth the idea, the hypothesis, that galantamine can be used as a treatment for Alzheimer's disease, but it provides no support sufficient to make one ordinary skill in the art believe that it would actually work as a treatment for Alzheimer's disease. Where in the record below is there a finding to the effect that the prior art, which is part of the record, within the application, as viewed through the prism of a person of ordinary skill in the art, would not be able to understand the utility and the enablement of the product? Yes, Your Honor. The Court makes reference first in paragraph 82 to her prior consideration of the prior art. There were extensive discussions of the prior art by the Court. Pages 3 through 13 of the order, there were 22 paragraphs of discussion of the prior art there. And then pages 25 to 35 of the order, there were 17 further paragraphs of discussion of the prior art there. Of the entire prior art? That's correct. Not the enablement issue, but the non-obviousness issue. It does, Your Honor. But when we say the entirety of the prior art, when you take that in the aggregate, the Court did deal with the entirety of the prior art. But it took the pieces of prior art piece by piece as you go through and made findings about what they showed. So, for instance, the cosinitis reference that counsel made reference to that is in the patent is specifically discussed by the Court in paragraph 30. She does discuss the prior art, but what she doesn't do, and I think this is what Judge Garris is asking about, she doesn't sort of dot the i's and cross the t's and say that the prior art and the patent doesn't show efficacy. She comes close to saying it at the top of page 44 of the joint appendix, but she doesn't say it explicitly. But what she says is, I guess I agree with Your Honor that she doesn't say it that explicitly. What she does say, though, makes it perfectly clear what her conclusion was based on the prior art, which is she makes a reference in paragraph 82 to the prior consideration of the prior art, where she discusses specifically the art related to phytostigmine that she has previously come to the conclusion would not have given one of ordinary skill an expectation that the drug would work. She then comes to the conclusion that for purposes of enablement, there isn't enablement because that art, the only art that was cited by the inventor here, does not give one of ordinary skill a belief that the drug would work. So paragraph 82 refers back to the prior art that was before. But maybe that's a bit of a cramped view because you're supposed to consider the patent as a whole, not just the listing of the prior art. Well, and she did consider the patent as a whole, Your Honor, and I think that's clear because she makes reference, really, for purposes of the enablement discussion. What plaintiffs raised were the prior art references in the background art portion of the patent and this animal model. She set forth both in her opinion. She considered both, and considering that all, came to the conclusion that there was no enablement here. And so she did consider the art. And as I was saying, Your Honor, the cosinitis reference, which counsel made reference to specifically, which is set forth in the patent, is something that the court specifically considered at paragraph 30 of her opinion, where she rejected what the inventor said was her view of what cosinitis taught, pointing out that that's not what cosinitis thought and not what cosinitis said. So the court considered the prior art that was set forth in the patent, concluded that that art was not sufficient to give one of ordinary skill a belief that it would work, and came to the conclusion that it was not enabling. But that's not a specific finding by the court below. 82 goes to the issue of exclusively in the prior art as to the establishment of enablement. But which prior art? She's talking both about non-obvious and enablement in that particular paragraph. This is 82. Yes, and as she says, this is in the section of the opinion, Your Honor, that is dealing with enablement, as you know. And at the bottom of the paragraph 82, at least the part of paragraph 82 that's on page 41, she says, in view of the prior art disclosures regarding the flaws of pyelostigmine in Alzheimer's disease treatment, and she just makes reference to where it was discussed. It was discussed previously in the context of obviousness. Now, we don't believe that in order to sustain her obligations under Rule 52, that she needs to repeat the discussion of the prior art again. It is sufficient to refer back to it. But it's not a question of repeating it. It's a question of putting the dots together as to whether or not she is focused on the issue of enablement within the four corners of the patent disclosure. Because that's what we're talking about. Yeah, that's what we're talking about here. That's correct, Your Honor. And I think she is, because that sentence goes on to say that it does not follow that a person of ordinary skill in the art would have recognized that galantamine would be effective in treating Alzheimer's disease in the absence of any experimental proof. So she is considering it in the context of enablement. She does not list all the prior art again at this point, but she's clearly making reference to the separate findings that she had made concerning the prior art before. But I tell you what the problem is. She said she seems to think plaintiffs rely exclusively on the prior art to establish enablement. I'm not, as I hear Mr. Papp is here this morning as I read the briefs, that seems to me not to be correct in the sense that it's not just that the prior art establishes enablement. It's that the prior art and the discussion of that prior art and other things in the patent shows efficacy. So maybe she was under a misapprehension as to what the argument was. No, Your Honor, I don't believe that that is any misapprehension on her part, because the art that is cited in the patent is, in terms of what it teaches, coextensive with the art that was considered in the context of the obviousness. What she did was list prior art. That's probably not sufficient to have an inventive contribution, but she said something about the prior art. She apparently deduced something from it. That's the claim as to what this invention is and whether you can infer efficacy from the description of the prior art or the other things that she said in the patent, not simply looking to the prior art standing alone. Your Honor, I guess the first point I would make is, all she does in the patent, the inventor does in the patent, is list the prior art with one-sentence descriptions of what that prior art says. There is no disclosure of any inventive insight in the patent. The theory that she came up with was, given the shorthand reference, the nicotinic receptor theory at trial. There is no mention of the nicotinic receptor theory in the patent at any point. There is nothing there on the face of the patent that would give anybody any idea that she had any particular insight into the cause of Alzheimer's disease or the effects of Alzheimer's disease that could be treated. There is nothing there that indicates to one of skill in the art that the nicotinic receptor has anything to do with that. Isn't that really a determination as to whether a person of ordinary skill in the art would be able to read that and make that determination? I could read it a thousand times, and I'm not a person of ordinary skill in the art, but a person of ordinary skill in the art with that template, would they be able to figure that out and connect the dots? The answer is no, Your Honor. The answer is no, and our expert, Dr. Levy, testified to that. He went through each piece of prior art that was cited in the patent, including the animal model, and came to the conclusion that there was nothing there that went beyond what anybody would have known. There was nothing there that would have led somebody to believe that there was something unique or inventive about what Dr. Davis had put into the patent. Will she make that conclusion in the opinion? There is not a specific conclusion that says that she accepts Dr. Levy's opinion in that regard. No, I understand that, but where in the opinion from Judge Robinson is there a statement to the effect that a person of ordinary skill in the art reading this patent disclosure, looking at the prior art, cited in the patent disclosure, would not be able to figure out what's going on? I think there is not a statement in one sentence to that effect, Your Honor, but I think it is the fair reading of the enablement section of the opinion that was written by the court. She sets forth the standards, and she sets forth the standards properly and accurately. She then goes through a discussion of what the prior art was and refers back to her previous discussions of the prior art, and then she comes to the conclusion that a person of ordinary skill in the art would not believe that galantamide would work with respect to Alzheimer's disease. And the standard under Rule 52, and incidentally, Rule 52 was mentioned for the first time in the reply brief, Your Honor, and so we don't think it's proper that that argument be made at this point. But the standard under Rule 52 is that there have to be findings sufficient to indicate the factual basis for the ultimate conclusions. There is no requirement. I think we know that rule quite well. Yes, Your Honor. I'm going to defer to my colleague. Thank you, Your Honor. May it please the Court, William Mercozzi for Miland and Alpha Farm. To just briefly address the Court's question on what one of ordinary skill would think about this two-column disclosure, we can go to the inventor's own statements in the file history. The examiner rejected this patent over that prior art that's set forth in the specification. The only art she uses to enable her patent. And in response to those rejections characterizing that art that the inventor now says discloses this nicotinic theory, she said nothing of the kind. She said that that art, she said it would be baseless to draw any inferences from that art on the utility for treating Alzheimer's with galantamide. The situation we're confronted with is that one side says the evidence is all in favor of them and as a matter of law they ought to win. You say on the other side that as a matter of law you ought to win, which leaves no room for the district judge. But suppose we were to conclude here that maybe the district judge could have come out either way. Then we have to worry about the findings, assuming that the issue were properly raised. So, I mean, you know, is this a situation in which there was evidence on both sides? We don't believe so, Your Honor. We believe that if you're looking for evidence of a credible or convincing utility in this patent, you can look both at the findings on the prior art in the obviousness case, which were the same prior art she uses to enable it. You can use the testimony of plaintiff's experts who all agreed and testified that no one would think to use galantamide, much less that it would work. And then you can use the inventor's own admissions and the file history where she says that prior art, which allegedly discloses this nicotinic theory, she told the patent office over and over, you can't draw any conclusions from it. No inferences of utility. She said it would be baseless to speculate that you could use galantamine for Alzheimer's. So this new theory, this nicotinic theory, it's as if this patent has arisen from the ashes and become something completely new on appeal. Now, having said that, there's a second problem with the disclosure. Even if it disclosed a credible utility, it still doesn't teach one how to actually practice the claimed invention or treatment method. And the district court recognized that as well at the very end of her opinion. If we look at these claims, they're extraordinarily broad. Claim 1 is drawn to any treatment of Alzheimer's with galantamine. Claim 4 is only slightly narrower. It's uncontroverted in the record that if a person of ordinary skill looks at this disclosure, they see nothing but old dosing information on uses that the inventor told the patent office have nothing to do with Alzheimer's. And then they see a dosing range that's lethal. The testimony was uncontroverted. The LD50 would be 1,400 milligrams per day. The claims say go up to 2,000. Claim 1 is unbridled. It could go even higher. That would kill the patient. So if we are to take plaintiff's suggestion that the whole answer here is the nicotinic theory plus a suggestion to titrate and start low and then move up, we wouldn't even get near the neighborhood of the high end of this claim, and you'd be killing half the patients. So there's a second problem. One of ordinary skill would not see anything efficacious in here, which I think answers your concern, Judge Dyke, is what in here suggests efficacy? Well, number one, she doesn't suggest it. She just gives a conclusion, use it. She gives no hypothesis whatsoever as to why. And number two, the ordinarily skilled practitioner, to go to your concern, Judge, would see an ineffective if not a lethal dose. And if Claim 4 is not enabled to its full scope, Claim 1, which is the independent and broader claim, which subsumes the subject matter of Claim 4, couldn't be enabled either because Claim 1 would then have an unenabled subject matter inside of it. So there's really two distinct problems here. But most of the claims do speak to rangers. Claim 4 speaks to 10,000 to 2,000 migs per day, Your Honor, which she was uncontroversial at trial that that would kill the patient. As a matter of fact, at 14,000. Whether it's 10 or whether it's 1,000 or 2,000. It's 10,000 to 2,000 per day, Your Honor, and you have to enable one of ordinary skill. So if you use a top range, then you're saying that the patient would not survive. It would kill the patient. What if you only use 10? If you only use 10 migs, the patient could survive, Your Honor. But the claim has to be enabled. But it is a range, isn't it? It is a range, Your Honor. It's 10 to 2,000 migs. Claim 1 is higher. It's broader. But you have to enable to its full scope. Plaintiffs didn't even attempt to defend Claim 4 on that ground because they couldn't. Because the trial testimony was uncontroverted. You can't use it. It would be inoperative at that range. So you have one of ordinary skill not able to even use this invention, even if he or she saw possible efficacy, they couldn't practice it to its full scope. One last issue. If enabled, it's our position that this patent, this invention is obvious. Obviously, the district court saw evidence that was not insubstantial. She rejected the obviousness challenge. But we didn't want to get into that on the opening. Your time has expired. Thank you, Judge. Judge DeFantis. Thank you, Your Honor. Judge Dyke, you asked me the conclusion of my argument whether we raised it in the opening brief. We did. Page 37, first paragraph. District court did not review the evidence set forth in the patent concerning galantamine's utility in treating AD for Alzheimer's disease. And it made no factual findings regarding the understanding a skilled artisan would have concerning galantamine's utility from the evidence set forth in the patent. That's it? That's it in the opening brief, Your Honor. But, Your Honor, I've listened to my opponent's argument with great care. And what I've heard is argument, but I haven't heard any evidence. And that's precisely what happened below. So let me cite some evidence that I'd like the court to focus on. First of all, Drs. Raskin and Coyle, two experts called by the plaintiff, by our client, said one could make and use this invention. It was scientifically reasonable, and they believed it. Those sites are in the record. Now I'm going to read you Dr. Levy. That's their expert. Question. Okay, would one of skill in the art in 1986, based on your review of the art concerning galantamine, have known what a therapeutically effective amount of galantamine would be? Yes. And a person in 1986 reading the patent would believe that galantamine would be a treatment for Alzheimer's disease. Is that correct? That's right. And such a person would be able to use galantamine as a treatment and could find therapy in an effective dose. Correct? Yes. Treatment by improving systems as was stated in the patent. All right, Mr. Pappas, thank you. We can read that. Your time has expired. Thank you, Your Honor. Case is submitted.